ANTHONY R. GALLAGHER
Federal Defender
P.O. Box 3547
Great Falls, Montana 59403-3547
Phone: (406) 727-5328
Fax: (406) 727-4329
Attorneys for William Vaughn Edwards



FILED
GREAT FALLS DIV.

'05 NOV 16 PM 4 41

PATRICK E.      CLERK
BY
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### Great Falls Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No. CR-05-81-GF-SEH-01** |
| Plaintiff, | |
| vs. | **DEFENDANT WILLIAM EDWARDS' MEMORANDUM IN AID OF SENTENCING** |
| WILLIAM VAUGHN EDWARDS and JAMES KENNETH EDWARDS, | **[SENTENCING DATE: DECEMBER 1, 2005]** |
| Defendants. | |

William Vaughn Edwards (Mr. Edwards), one of the above named Defendants, by and

through his attorneys, Anthony R. Gallagher and the Federal Defenders of Montana, hereby submits

this Sentencing Memorandum pursuant to the Court's scheduling Order dated August 8, 2005.

### I.     Introduction

On August 4, 2005, Mr. Edwards was found guilty by a jury of Possession of Cocaine with

Intent to Distribute. Mr. Edwards was remanded to the custody of the United States Marshal pending

sentencing and a presentence investigation report (hereafter "PSR" or "report") was ordered.

The draft PSR was timely completed. When submitted to the parties, Mr. Edwards noted objections to the facts as reported and to the advisory guideline calculation since this matter proceeded to trial. The Government submitted no objections to the draft PSR.

This Memorandum is intended to put before the Court arguments on Mr. Edwards's behalf at his sentencing, as permitted by U.S.S.G. § 6A1.3 and Fed.R.Crim.P. 32, in support of a reasonable sentence under the applicable sentencing scheme. Further, this Memorandum is filed in accord with the Court's scheduling Order requiring the parties to file a sentencing memorandum no later than November 16, 2005.

## II.     The Facts are Disputed

Mr. Edwards proceeded to trial. The Defendant, therefore, disputes all factual matters in the Offense Conduct section of the report inconsistent with innocence. *See, United States v. Houston,* 217 F.3d 1204 (9th Cir. 2000).

## III.     The Sentencing Procedure

The sentencing in this case is arguably affected by *United States v. Booker,* 125 S.Ct. 738 (2005).[1] In *Booker,* the Supreme Court ruled that the mandatory nature of the federal sentencing guidelines triggers the Sixth Amendment. Because judge-found facts are essential to an enhanced sentence under the guidelines (i.e., absent those facts, a judge is *required* to sentence within a lower range), those facts must be found by a jury beyond a reasonable doubt unless they are admitted by the defendant. *Booker,* 125 S.Ct. at 749-50.

---

[1] For offenses committed before *Booker* was decided, like Mr. Edwards's, there is no mandatory sentencing "floor" but there is a mandatory sentencing "ceiling"– the top of the applicable guideline range taking account only jury-found or admitted facts.

In fashioning a remedy, the Court ruled that severance and excision of the sections of the

Sentencing Reform Act that make the sentencing guidelines mandatory would both cure the Sixth

Amendment problem and be preferred (over total invalidation of the Sentencing Reform Act) by

Congress. The result is that the sentencing guidelines are now "effectively advisory." *Id.* at 756-57.

In sentencing a defendant, a district court must impose a sentence that is "sufficient but not greater

than necessary" to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2):

(1)     retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");

(2)     deterrence;

(3)     incapacitation ("to protect the public from further crimes"); and

(4)     rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

In setting a sentence minimally sufficient to comply with these purposes, a district court must

consider five additional factors: (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the kinds of sentences available; (3) the guidelines and policy

statements issued by the Sentencing Commission, including the sentencing guidelines; (4) the need

to avoid unwarranted sentencing disparity; and (5) the need to provide restitution to the victim. *See,*

18 U.S.C. § 3553(a)(1)-(7). Neither the statute itself nor *Booker* suggests that any one of these

factors is to be given greater weight than any other factor. However, it must be kept in mind that all

of the factors are subservient to § 3553(a)'s mandate to impose a sentence not greater than necessary

to comply with the four purposes underlying the Sentencing Reform Act.

Following the lead of the Second Circuit, the Ninth Circuit, sitting *en banc*, has recently

decided *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). Addressing unpreserved

*Booker* error cases, *Ameline* primarily discusses the plain error test to be applied and the limited

remand defined in *United States v. Crosby*, 397 F.3d 103 (2nd Cir. 2005). The Ninth Circuit did not

delve into an extensive discussion of the sentencing process to be employed post-*Booker*. Even so,

our circuit favorably views the Second Circuit's approach. Mr. Edwards, therefore, relies on

*Crosby's* discourse on the post-*Booker* sentencing scheme, namely that the "applicable Guidelines

range is normally to be determined in the same manner as before Booker/Fanfan." *United States v.*

*Crosby*, 397 F.3d 103, 112 (2nd Cir. 2005). The Second Circuit went on to state that

> . . . it would be a mistake to think that, after Booker/Fanfan, district judges may
> return to the sentencing regime that existed before 1987 and exercise unfettered
> discretion to select any sentence within the applicable statutory maximum and
> minimum. On the contrary, the Supreme Court expects sentencing judges faithfully
> to discharge their statutory obligation to "consider" the Guidelines and all of the
> other factors listed in section 3553(a).

*Crosby*, 397 F.3d at 113.

As stated previously, although the advisory Guidelines system does not arouse Sixth

Amendment concerns raised by the merits majority opinion in *Booker*, this is not to say that there

are no longer any constitutional constraints on sentencing, even as applied to the post-*Booker* system.

And ". . . the Supreme Court left unimpaired section 3553(c), which requires a district court to

"state in open court the reasons for its imposition of the particular sentence" and, in subsection

3553(c)(2), to state in writing "with specificity" the reasons for imposing a sentence outside the

calculated Guidelines range." *Id.* at 116.

Even the dissent in *Booker*, uncontradicted by the opinion of the high Court, acknowledged the "surviving requirement that the [district] court set forth the specific reason for the imposition of a sentence different from that described in the Guidelines." *Booker*, Dissenting Opinion of Justice Scalia at 3 (quoting 18 U.S.C.A. § 3553(c)(2)). This requirement from § 3553(c)(2) was not excised by *Booker*, and it continues to govern sentencing courts. Clearly, that requirement will aid in determining the individual factors of the offense and the individual details pertinent to the offender leading to a post-*Booker* sentence.

Sentencing post-*Booker* is, therefore, comprised of two distinct considerations: the sentencing mandate contained in the prefatory clause of § 3553(a) and the "factors" to be considered in fulfilling the mandate.

## IV.    The Sentencing Mandate

The congressional command is that the Court "shall" impose a sentence that is sufficient "to comply with the purposes set forth" in the Sentencing Reform Act. Those purposes, discussed more fully below, suggest that a sentence at or below the low-end of the advisory Guideline range is the reasonable sentence.

### A.    Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The offense of conviction, Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1) and (2), calls for a maximum term of twenty (20) years imprisonment, a $1,000,000 fine, and at least three (3) years of supervised release. These penalties may be enhanced if the Government proves prior drug-related felony convictions. While it is true that Congress obviously felt that a sentence of twenty (20) years was appropriate in some circumstances, the

legislature also knew that a probationary sentence could be appropriate. *Compare*, 18 U.S.C. § 1708 and 18 U.S.C. § 3561(c)(1). Therefore, the length of the term called for in the most extreme cases is not the only measure of offense seriousness.

## B.   Deterrence

Several indicators demonstrate that Mr. Edwards has already been deterred from future criminal conduct. He has shown the Court he possesses the ability to comply with conditions imposed by the Court as the PSR reports at ¶ 6:

> On October 28, 2004, prior to the **defendant's** arrest [for the instant offense], United States Probation Officer (USPO) Todd McLean conducted a search of the **defendant's** residence in Missoula. USPO McLean observed no drugs or drug paraphernalia in the residence. The **defendant** provided a negative urinalysis confirming he had not used any narcotics. On October 29, 2004, the **defendant** submitted to another urinalysis, which tested negative for all substances.

¶ 19 of the PSR (emphasis in original).

William Edwards is motivated to remain crime-free. His family obligations (for Jennifer Bird's five year old son, Tristen, to whom the defendant has become a father figure – see ¶ 52 of the PSR) serve as an impetus to return to the good behavior that preceded his involvement with cocaine and the incidents which gave rise to this conviction.

## C.   Protect the Public from Further Crimes of the Defendant

A sentence at or below the advisory guideline range will protect the public from further crimes by Mr. Edwards. Such a sentence would allow the Court (through the United States Probation Office) to monitor Mr. Edwards's activities closely, assuring that he remains fully employed and maintains sobriety and freedom from drug abuse.

**D.    Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

For William Edwards a lengthy custodial sentence would frustrate rather than promote training, care and treatment. Such a sentence would remove Mr. Edwards from the work force for a long period of time, interrupt the societal advancements he has already made, and undermine the use and improvement of his many job skills. There is no advantage to a long Bureau of Prisons placement.

Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, the sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." Thus, to the extent that Mr. Edwards is in need of continued correction and rehabilitation, this statutory provision provides separate statutory support for a brief custodial sentence.

**V.    Sentencing Factors**

    **A.    The Offense and the Offender**

        **1.    Nature and Circumstances of Offense**

The details of the offense are related at ¶¶ 7-20 of the PSR. In response to Defense Counsel's disagreement with the offense conduct section of the PSR, the United States Probation Officer notes in the Addendum to the PSR that "[t]he offense conduct was formulated from law enforcement reports following the instant offense." While the undersigned is certain that the rendition in the PSR accurately reflects the Government's submissions, the facts adduced at trial were in some instances different from the version related in the police reports.

Paragraph 17 of the PSR indicates that: "While James was in Cut Bank, officers observed the **defendant** and an unknown male arrive at James' residence in a dark colored mini van with Alberta, Canada, license plates." Actually, Gabe Grant, a neighbor of James Edwards, was carrying on surveillance from the late afternoon of October 28, 2005, when Special Agent Clinton Dalrymple was called away to perform other duties after James Edwards left his residence at about 5:00 p.m. Reporter's Transcript of the Trial (hereinafter RT-TR) at pages 25-27. At about 7:50 p.m., Grant saw William Edwards arrive in a van bearing Alberta plates operated by Tom Edwards. William gained entry through a window; then Tom entered through the front door. RT-TR 27-29. When he entered, William was wearing a dark sweat shirt. RT-TR 33 and 34.

Paragraph 18 indicates that "The **defendant** was in possession of $1,247 cash and several small bags, as well as one larger bag, of cocaine . . . " (Emphasis in original). At trial, however, James Edwards testified that William Edwards told him that the large bag of cocaine found in the bedroom belonged to Tom Edwards. RT-TR 103-104. Only the money and numerous small baggies of cocaine were in William Edwards' possession when he was arrested in the living room. RT-TR 56-58 and 66-67. When James returned from Cut Bank with his girlfriend, Janet Lamere, on the evening of October 28, William and Tom were at the house. RT-TR 97-98. William was in the livingroom wearing a white hooded pull-on sweater and Tom was coming out of the bedroom. RT-TR 101-102.

The PSR also says:

On October 30, 2004, Allie Edwards, the **defendant's** sister, received a call from her brother, Tom Edwards. Tom advised Allie, *Jim and Janet are totally innocent, they didn't have anything to do with this, they shouldn't even be in jail.* He further [sic] *Bill should have never got back into dealing drugs.*

Paragraph 20, PSR. (Emphasis in original). The above- quoted portion of Allie Edwards's statement is contradicted by a notarized letter from Tom Edwards, dated November 12, 2005. *See* Sentencing Exhibit No. 1.

Further, statements provided to Cinda and Nicole Edwards in early 2005 refute claims made by James Edwards regarding responsibility for the cocaine and cocaine sales. *See* paragraphs 21-22. The claim by James reflected in PSR paragraph 23 that he was pressured to give those statements, is likewise contradicted. Cinda and Nicole testified at trial that he willingly gave those statements, even to the point of making corrections before signing the typewritten version. RT-TR 209-218 and 222-225. According to a letter provided to Virgil Edwards (William's father and James's brother), by Merlyn Thomas, James had made similar statements exculpating William to Merlyn while in the tribal jail in January/February 2005. *See* Sentencing Exhibit No. 2.

Conflicting accounts of the October 28 incident and other actions by James Edwards significantly undermine his credibility. James's rendition of the facts is not worthy of belief.

## 2.      History and Characteristics of Mr. Edwards

William Edwards was born and raised in Browning. He is a high school graduate and attended some college. Although he has no natural children of his own, his former wife's daughter, Taila, considers him her father. Although Mr. Edwards has no legal obligation to do so, he provides emotional and financial support to Taila. Again, despite having no legal parental or custodial rights, since 2002, Mr. Edwards has spent a lot of time with Tristen Bird, the son of a former girlfriend.

Mr. Edwards has been employed most of his adult life in a variety of sales and marketing positions including ownership of his own used car sales business. Even as a youth he was motivated to work and support himself. Despite substantial job experience, he has no assets or liabilities.

### B.    The Kinds of Sentences Available

Mr. Edwards was found guilty of a violation of 21 U.S.C. § 841(a)(1) and (2). The penalty for the offense, in § 841(a)(2), is a term of twenty (20) years imprisonment, a $1,000,000 fine, and at least three (3) years of supervised release. These penalties may be enhanced if prior drug-related felony convictions. If the Government is able to prove prior conviction(s), the maximum term of imprisonment is not more than 30 years, pursuant to 21 U.S.C. §§ 841(b)(1)(C) and 851.

Potentially, under 18 U.S.C. § 3561(a)(1), a term of probation is not authorized since the offense could be a Class B felony. Should the defendant be sentenced to a term of imprisonment pursuant to the provisions of 18 U.S.C. §§ 3583(b)(1)(C) and 851, a term of supervised release of not more than six (6) years shall be imposed.

### C.    The Guidelines and Policy Statements

According to the PSR, based on a total offense level of 20 and a criminal history category of III, the guideline imprisonment range is 41 to 51 months. *See* PSR ¶¶ 28-37 and 41-47, respectively.

Based on the factual disputes discussed previously, and without waiving any objection to the facts inconsistent with actual innocence, the amount of cocaine actually possessed by William Edwards was far less than that attributed to him in the PSR. The defense submits that even in a light most favorable to the Government he possessed only the amount found on his person. Therefore, the offense level specified in the Drug Quantity Table is found in U.S.S.G. § 2D1.1(c)(13), a base offense level of 14 (at least 25 grams, but less than 50 grams of cocaine). Based on a total offense level of 14 and a criminal history category of III, the guideline imprisonment range is 21 to 27 months.

### D.    The Need to Avoid Unwarranted Sentencing Disparity

Avoiding unwarranted sentencing disparity was the main goal of the Sentencing Reform Act. The Guidelines were primarily formulated to eliminate the unwarranted disparities that proliferated under the prior sentencing regime and to foreclose the consideration of race, gender, and other illegitimate factors at sentencing. As *Booker* explains, Congress' "basic statutory goal in enacting the Guidelines was to provide a sentencing system that diminishes sentencing disparity" and "to move the sentencing system in the direction of increased uniformity." *Booker*, 125 S.Ct. at 759. Formerly, rather than reflect legally relevant criteria, disparity too often was correlated with constitutionally suspect variables. *See e.g.*, Breyer, The Federal Sentencing Guidelines and Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 5 (1988).

The conduct for which Mr. Edwards now stands convicted was the subject of revocation proceedings in 2004. He is currently serving a sentence related to that revocation. To avoid sentencing disparity, credit should be given for the time served since arrest for the revocation.

### E.    The need to provide restitution to the victim

The need to provide restitution, the final element discussed in 18 U.S.C. § 3553(a)(2) and *Booker*, is *not* a factor in this case.

### VI.    Financial Condition and Fines

As the financial section of the PSR reflects (see ¶¶ 49-51), Mr. Edwards is and will be unable to pay a fine of any amount. According to U.S.S.G. § 5E1.2, Comment. No. 3:

> [t]he determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay a fine. [Further] [t]he fact that a defendant is represented by assigned counsel . . . [is a] significant indicator[ ] of inability to pay any fine.

The Court appointed Counsel from the office of the Federal Defenders of Montana, based in part on a finding that his financial condition would not permit him to retain qualified counsel. It is highly unlikely that the Defendant will acquire the financial ability to pay any fine during a period of custody or supervision. *See, United States v. Outland,* 1099 F.3d 539, 549 (9th Cir. 1994); *United States v. Robinson,* 20 F.3d 1030, 1034 (9th Cir. 1994). A fine should not be imposed. *See, United States v. Ladum,* 141 F.3d 1328, 1344 (9th Cir. 1998).

## VII.   Conclusion

For the reasons stated and applying the criteria set forth in 18 U.S.C. § 3553(a) to Mr. Edwards' case, and accounting for the corrections and disputes discussed above, a sentence at the low-end of the advisory guideline range is a sufficient sentence, "but not greater than necessary."

RESPECTFULLY SUBMITTED this 16th day of November, 2005.

ANTHONY R. GALLAGHER
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2005, a copy of the foregoing Memorandum in Aid of

Sentencing was mailed by first class mail (prepaid) or otherwise caused to be delivered to:

MR. JOSEPH E. THAGGARD
United States Attorney's Office
P.O. Box 3447
Great Falls, MT   59403

MS.ANDREA L. HEDGES
United States Probation Officer
P.O. Box 1366
Great Falls, MT 59403

MR. WILLIAM VAUGHN EDWARDS
Crossroads Correctional Facility
75 Heath Road
Shelby, MT 59474

FEDERAL DEFENDERS OF MONTANA



DEFENDANT'S
EXHIBIT

1

To Whom It May Concern:

I Thomas W. Edwards make this statement of my own free will.
First I want it to be known that I have never seen my nephew, Bill
V. Edwards, sell any drugs, give anyone drugs, or trade anything
for drugs.
Secondly, I know that Bill V. Edwards had absolutely nothing to
do with the drug activity conducted at the Jim K. Edwards
residence in Browning.
On October 28th, 2004, I gave my nephew Bill V. Edwards a ride
to Browning from Missoula. Bill was going to do some
construction work for Bill Bremner. My niece, Nicole Edwards
was to pick him up while he waited at Jim's house. Bill and I went
into the house and a short time later Jim arrived. Bill went into the
bathroom to take a shower. I left for Canada while Bill was in the
shower.

It has also come to my attention that Alice Edwards has made a
statement to the effect that I (in a telephone conversation) alleged
that Bill Edwards was dealing in drugs. I have never stated to
Alice Edwards at any time this information. What she has reported
in a statement is untrue.

Thomas W. Edwards

*Thomas W. Edwards*

Declared before me
at the city of Lethbridge
in the province of
Alberta, this 12th day of
November 2005.

*L Schlachter*

LINDSEY E. SCHLACHTER
A COMMISSIONER FOR OATHS
IN AND FOR THE PROVINCE OF ALBERTA
MY COMMISSION EXPIRES OCTOBER 15, 2008.

DEFENDANT'S
EXHIBIT
2

Dear Puggy                                    Aug 11 2005

I just heard that bill lost his case. I'm
Really surprised that he lost  I was under the
impression that Jimmy was going to testify
for him not against him.

When I heard that Jimmy testified
against Bill I was thinking that it must
be a mistake. I was in jail with Big
Jim in browning. It must have Jan or Feb
of 2004 I remember it was cold,

Any way. At that time big jim was talking
about his case. He told me that he felt
Bad that bill was in jail and that He
went to prison for nothing. When I asked
What he meant he said that none of the Drugs
in that house are in the jacket Bill was
Wearing Where Bills. I'm sorry to here that
Bill was found Guilty And I'm surprised Big Jim changed
his story are made one up anyway If I can ever
help, maybe on Appeal I will be happy to.
                                        Marilyn Thomas